Filed 7/1/25  P. v. Lopez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>HECTOR MANUEL LOPEZ,<br><br>    Defendant and Appellant. | F087055<br><br>(Super. Ct. No. SUF19495)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from an order of the Superior Court of Merced County.  Steven K. Slocum, Judge.

Carla J. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Michael A. Canzoneri and Barton Bowers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Detjen, A.P.J., Peña, J. and DeSantos, J.

In 1996, defendant Hector Manuel Lopez was convicted of second degree murder, three counts of premeditated attempted murder, and three counts of assault with a firearm. He was sentenced to a term of 15 years to life for the second degree murder conviction and three consecutive terms of life with the possibility of parole for the three attempted murder convictions. In 2019, defendant petitioned the superior court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on his convictions for second degree murder and attempted premeditated murder. The superior court summarily denied the petition, holding that section 1172.6 was unconstitutional. In 2021, we reversed and remanded. On remand, the trial court denied defendant's petition at the prima facie stage, after appointing counsel.

Defendant again appealed, arguing the trial court erred in denying the petition at the prima facie stage because the record does not conclusively establish that he was precluded from relief. The People agreed and we reversed. On remand, after taking evidence and hearing argument, the trial court denied the petition.

On appeal, defendant contends (1) the evidence was insufficient to support defendant's second degree murder conviction, (2) the trial court erred in finding defendant was the actual shooter despite the jury's not true finding on the firearm allegations, (3) the evidence was insufficient to support defendant's three attempted murder convictions, (4) the court erred in relying on the kill zone theory for the murder and attempted murder convictions, (5) the court erred in failing to consider defendant's youth at the time of the offenses, and (6) to the extent consideration of defendant's youth was forfeited, his counsel was ineffective. The People disagree on all accounts. We affirm.

---

[1] Undesignated statutory references are to the Penal Code unless otherwise indicated. Former section 1170.95 recently was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will refer to the current section 1172.6 in this opinion.

# PROCEDURAL HISTORY[2]

On May 2, 1995, the Merced County District Attorney filed an information charging defendant with first degree murder of Juan Viera (§ 187, subd. (a); count 1), three counts of attempted premeditated murder (§§ 187, subd. (a), 664; counts 2, 4, & 6), and three counts of assault with a firearm (§ 245, subd. (a)(2); counts 3, 5, & 7). As to each count, the information further alleged that defendant personally used a firearm (§ 12022.5, subd. (a)). As to counts 2, 4, and 6, the information alleged that defendant was armed with a firearm (§ 12022, subd. (a)(1)).

On May 6, 1996, a jury found defendant not guilty of first degree murder, but guilty of second degree murder on count 1. The jury further found defendant guilty as charged on counts 2 through 7. The jury found the premeditation allegations true as to counts 2, 4, and 6, but found the firearm allegations not true as to all counts.

On July 18, 1996, the trial court sentenced defendant as follows: on count 1, 15 years to life; on counts 2, 4, and 6, consecutive terms of life with the possibility of parole; and on counts 3, 5 and 7, four years (the upper term), stayed pursuant to section 654.

On November 1, 2019, defendant filed a section 1172.6 petition seeking resentencing and requesting appointment of counsel. On December 24, 2019, the trial court denied the petition, holding that section 1172.6 was unconstitutional. On June 23, 2021, we reversed.

On January 28, 2022, after appointing counsel, but without issuing an order to show cause or holding an evidentiary hearing, the trial court denied defendant's petition. On January 23, 2023, we reversed and directed the court to issue an order to show cause.

---

[2] We summarize only the procedural history relevant to our review of the order denying defendant's section 1172.6 petition.

3.

The trial court issued an order to show cause and, on October 13, 2023, held an evidentiary hearing.  After taking evidence and hearing argument by the parties, the court denied defendant's petition.

On October 16, 2023, defendant filed a notice of appeal.

<u>**FACTUAL SUMMARY**</u>

## A.  Trial Testimony[3]

### The People's Case

Javier T. grew up in Merced and became a member of the M Street Mob, a Norteño street gang, at 11 or 12 years of age.  Norteños were associated with the color red and the number 14.  Norteños considered Sureño gang members, who were associated with the color blue and number 13, enemies.  The M Street Mob claimed specific locations in Merced, as did Sureño gangs.  Javier was no longer a member of the M Street Mob in September 1993, but he was friends with members.  Prior to September 1993, Javier was involved in eight to 10 "altercations" with Sureño gang members.  Some of those altercations took place when Javier was a member of the M Street Mob.

On September 19, 1993, Javier went to a party in Merced at approximately 5:00 p.m. or 6:00 p.m. with Mark S.  Javier also saw Lucio R. and Anthony B. at the party.  Mark was not an M Street Mob member; Lucio was an active M Street Mob member; Anthony was a former M Street Mob member.  While they were at the party, Lucio was involved in a verbal altercation with a Sureño gang member.  Present during the altercation were approximately eight Sureños and three or four of Javier's "M Street

---

[3]     The summary of the trial testimony is drawn from the reporter's transcript in *People v. Lopez* (Feb. 19, 1998, F026470) as modified Mar. 19, 1998 [nonpub. opn.] (*Lopez*).  The parties rely on the record in *Lopez*, *supra*, F026470, in their briefing.  We provided notice that we were considering taking judicial notice of the record in that matter and afforded the parties time to file objections.  Neither party objected.  (Evid. Code, §§ 452, subd. (c), 455, subd. (a).)  We grant judicial notice of the clerk's transcript and reporter's transcript in *Lopez*, *supra*, F026470.  (Evid. Code, §§ 452, subd. (d), 459, subds. (a)–(c).)

4.

friends." Lucio and his opponent agreed to go to a nearby elementary school to fight. Javier, Lucio, and approximately 20 other "members of M Street" went to the elementary school approximately 10 minutes later. The Sureño gang members did not go to the school so the M Street Mob members and associates "[w]ent looking for them." Approximately 10 minutes later, they arrived at the home of Jose C., whom Javier knew to be a Sureño gang member. Defendant, Willie N., and a third man Javier believed to be a Sureño gang member were at the streetcorner by Jose's house. Javier knew defendant when they were younger and had seen him in the presence of Sureño gang members approximately 10 times before. Defendant and Willie walked or ran to a nearby house or alley; the third man approached Javier with a knife and said "13." Javier retrieved a metal bar from his truck and the third man left. Several of Javier's group went to the house to which defendant and Willie had run. Several Sureño gang members threw rocks at people from Javier's group and "somebody yelled out" that the police were coming so Javier's group left the area.

On the evening of September 20, 1993, Javier, Mark, and Juan[4] V. went to a bus stop near the home of Louie C., an M Street Mob member who lived in one of the areas claimed by the M Street Mob, to see their friends. Juan was an M Street Mob member. When they arrived, Christina G., the sister of an M Street Mob member, and Mike M., an M Street Mob member, were present. After Javier's group arrived, Anthony and his cousin Manuel C., who was not an M Street Mob member, arrived. Lucio was also at the same location, but Javier did not remember if he arrived before or after Javier's group.

Less than an hour after Javier arrived, he saw a full-sized truck with a black rack on the back. The truck was driving very slowly, "maybe two [or] three miles [per] hour," at its slowest. Javier saw three people in the cab of the truck and one person in the bed.

---

[4]      There is a single reference in the trial transcript to "Paul V[.]" It appears to be a mistranscription of "Juan V[.]"

He approached the truck to see if he knew the occupants. Juan was behind Javier as he approached the truck. Javier recognized Alberto M. in the middle seat of the cab; they had attended junior high school together. He had seen the man in the driver's seat before but did not know his name; he did not know the man in the passenger's seat. As Javier approached the truck, defendant sat up in the bed of the truck. He recognized defendant because they had gone to school together. Approximately 30 seconds after Javier first saw the truck, when Javier stood about one arm's length from the truck, the man he did not know in the right passenger seat of the truck revealed a black semiautomatic handgun and fired approximately 10 to 12 shots. Manuel heard approximately 20 shots. Javier only saw a single shooter, but because some of the shots sounded louder than others, Javier believed there were two shooters. Mark did not see the person in the bed of the truck holding a gun and saw no muzzle flashes come from the bed of the truck. Manuel did not see a gun and was unable to tell whether the shots made different sounds. Manuel also testified only one person fired a gun—the person in the right passenger seat of the cab. However, three days after the shooting, Manuel told Merced Police detective Marty Clair that he was "pretty sure someone in the back was shooting."

When the shooting started, Javier ran behind nearby cars, following Juan, and was struck by a shot in the calf. The wound was small and consistent with a .22-caliber bullet. Manuel was also struck by a shot during the shooting; he was hit on the stomach. He believed he was shot with either a .22-caliber or nine-millimeter bullet based on the size of the bullet hole. Anthony was struck by a shot during the shooting; he had a wound consistent with a .22-caliber bullet on the back of his knee.

After the truck carrying the shooters left, Javier saw Juan lying face down on the sidewalk with blood pooling on his upper back. Juan was conscious and asked for help, but he did not move. Mark found a bullet hole in his pants the next day, but he suffered no injury.

On September 20, 1993, Merced Police officer Paul Stone was the first officer to arrive at the scene after the shooting. He saw that Juan appeared to have been shot in his back, Manuel appeared to have been shot in his abdominal area and left wrist, and Anthony appeared to have been shot in his left leg. Javier told Stone he was shot on his lower left leg. Within an hour of Stone's arrival at the scene of the shooting, after paramedics took Juan to the hospital, Stone spoke to Juan at the hospital. He recorded the conversation because he suspected Juan may die, and he told Juan as much. Juan told Stone that Javier knew the name of the man who shot him. At the scene of the shooting, Javier told Stone the first names of two men he believed to be involved in the shooting: Hector and "Zoe." Stone knew "Zoe" to be the gang moniker of Jose, and Javier confirmed that Jose was the person he was referring to. Stone did not recall whether Javier said the man he knew as Hector was in the cab or bed of the truck. At a prior hearing in the case, Stone stated, " 'To the best of my recollection, I believe [Javier] stated they were in the cab … of the pickup.' " He testified that he believed his prior statement to be incorrect because his report did not reflect that detail. None of the witnesses Stone spoke to mentioned seeing more than one gun and the gun they saw was in the cab of the vehicle.

On September 20, 1993, at around 9:20 p.m., Merced Police detective Donald Varney arrived at the location of the shooting. He found bullet holes on vehicles parked by the location of the shooting, a bullet fragment near the one of vehicles, and eight .22-caliber bullet casings which were all between approximately 100 and 200 feet from the intersection near where the shooting took place.

James Wilkerson was the pathologist who performed the autopsy of Juan's body. Juan had three bullet wounds to his back: one below his shoulders, and two to his left buttock. The bullet wound below Juan's shoulders was a fatal wound. Wilkerson retrieved all three bullets. The bullet removed from the bullet wound below Juan's shoulders was larger than the other two bullets. Detective Clair was present at the

autopsy. He took possession of the larger bullet which caused Juan's death and provided it to the Department of Justice laboratory. Clair also obtained a .38-caliber bullet that was recovered from the trunk of Javier's vehicle after the shooting and provided it to the Department of Justice laboratory.

Department of Justice assistant crime laboratory director Duane Lovaas examined the .22-caliber casings recovered from the scene of the shooting and determined that all eight of the casings recovered from the scene of the shooting were fired from the same firearm. He also examined the two bullets provided by Clair. Both were .38-caliber bullets, and both were fired from the same firearm—either a derringer or a revolver. Based on the rarity of the derringer models that could have fired the bullets, he opined the two .38-caliber bullets were likely fired from a revolver.

Merced Police sergeant Tommy Martin was assigned to the gang violence suppression unit. He opined the shooting was consistent with a retaliatory attack based on the events of the night before the shooting.

Defendant was arrested in March 1995. On March 8, 1995, Clair conducted an interview of defendant. Defendant initially denied being a Sureño gang member, and then immediately after admitted being a Sureño gang member.

Defendant also discussed the shooting: Rogelio N. was the driver, Alberto was in the middle of the cab, Keith N. was on the right passenger side and was the shooter, and defendant was alone in the bed of the truck. Defendant denied knowing the people who were shot at and whether they were Norteño gang members. He denied having been at the party the night before the shooting, but he understood that "M Street" was involved in the altercation. On the night of the shooting, Keith told defendant they were going to go "beat[] these guys." He initially said he did not know Keith had a gun when he got in the truck. He later said that Keith and Alberto each showed him a gun before defendant got into the truck; Keith told defendant "let's go f[**]k the guys" or " 'let's go f[**]k these guys up,' " and also said " 'let's go' " and pulled the gun out of his waistband. Defendant

8.

initially said he did not have a gun, but he confirmed that two guns were used in the shooting. He said Alberto had the .22-caliber gun and Keith had a gun with "the big bullets." Defendant later said that Keith had a .22 caliber gun and defendant had a .38-caliber gun with a five-round cylinder. Defendant had purchased the gun three weeks prior to the shooting from an unnamed man in Stockton. On the day of the shooting, Alberto gave him .38-caliber bullets for the gun and defendant loaded the ammunition into the gun before they left his home. During the shooting, defendant pointed his gun at Juan and fired all five shots. After the shooting, defendant stayed at Keith's house for five minutes and then walked home. Three days later, defendant went to Mexico because he "got scared" of retribution.

Fernando M. was a Sureño gang member and had been for approximately five years. Fernando would "hang out" with other Sureños, including Willie, at an alley by Jose's house. In September 1993, he did so approximately three times. Fernando saw defendant at Jose's house twice in September 1993. He thought defendant was a Sureño gang member because he spent time with Sureño gang members, but he was not certain. Fernando knew nothing about defendant's involvement in the shooting.

Defendant's brother testified that defendant was not in Merced on the date of the shooting. He denied telling an officer that defendant left for Mexico within a day of the shooting. He did not know if his brother was a Sureño gang member. Defendant's brother was not a Sureño gang member. He did wear a belt with an "S" buckle to court.

**Defendant's Case**

Defendant testified he came to Merced from Mexico when he was 14 years old. He spoke no English before coming to Merced. He attended classes at junior high and high school but he did not understand English, so he did poorly. He spoke only Spanish at his home in Merced and, when he spoke to classmates, he spoke in Spanish. Defendant left Merced for Mexico on September 8, 1993, and arrived on September 11 or 12, 1993. Soon after he arrived in Mexico, approximately September 14 or 15, 1993,

defendant went to a hospital and had gallbladder surgery.  He then spent about five days in the hospital.  It took defendant six or seven months to fully recover from his surgery. Defendant did not return to Merced until 1995.

Defendant was arrested on March 3, 1995, in relation to this case.  He was brought to a small room in handcuffs.  Defendant's handcuffs were removed, and two officers began asking him questions.  Defendant told the officers at least twice he did not understand what they were saying, but he did not tell them he did not understand English because they did not ask.  One of the officers took out a firearm and "lifted [it] up." Defendant thought the officers were going to "take words out of [him] by force." Defendant was not truthful with the officers when he said he was in Merced on September 20, 1993, that he had a firearm in the summer of 1993, that he was a gang member, and that he shot Juan.

A bilingual paraprofessional testified that she tested defendant's English proficiency on January 15, 1996.  His score in English was the lowest possible score.  A forensic psychologist also testified.  She detailed common features and frequency of false confessions.

Defendant's sister, brother, mother, and girlfriend all testified defendant left Merced for Mexico on September 7 or 8, 1993.  Another of defendant's sisters and his mother testified that he arrived in Mexico prior to the shooting, was hospitalized, and had surgery.

## B.  Section 1172.6 Hearing Testimony

Defendant testified, on September 20, 1993, he was 19 years old and lived in Merced.  He did not know Juan Vierra, Anthony, or Manuel, but he had gone to school with Javier.  He had also heard of the " 'M Street Mob,' " which he understood to be a Norteño gang.  After September 20, 1993, defendant learned Javier was a member of the M Street Mob.

10.

In September 1993, defendant was friends with Willie and Keith. He met both at high school. None of the three were Sureño gang members. Defendant also knew Alberto, Fernando, and Jose, but he did not know if any of the men were Sureño gang members.

On the evening of September 19, 1993, defendant saw a fist fight between Javier and Jose. Javier broke windows of Jose's home using a metal bar.

On the evening of September 20, 1993, defendant was outside the apartment complex where he lived and was picked up by Alberto, Keith, and Willie in a pickup truck. None of the men told defendant where they were going; they just said " 'Let's go for a ride. Let's take a trip.' " Defendant entered the rear cargo area of the pickup while the other three men rode in the front passenger area. Defendant was lying in the pickup cargo area when he heard gunfire, but he did not participate. None of the men showed defendant a gun before the shooting and defendant did not possess or fire a gun that night. Defendant did not encourage anyone to shoot and did not assist anyone in shooting. He did not kill anyone that night.

After the shooting, defendant walked home and the other men went to Willie's house. He did not hear or participate in any conversation about the shooting with Alberto, Keith, or Willie after the shooting. In 1993, after the shooting, defendant went to Mexico and stayed there until 1995. He feared that members of M Street Mob might take revenge against his family if he did not leave.

Before his jury trial in this case, defendant spoke to a police officer about the shooting. They spoke in English, but defendant was not comfortable speaking English in 1993. Defendant did not remember telling the officer: that Willie had come to defendant and said, " 'Let's f[**]k those guys up' "; that defendant had a .38-caliber firearm during the shooting; that Alberto had given him ammunition for the firearm; or that he fired five times, emptying the gun. None of those things actually happened. Defendant was

11.

forced to make those statements when a police officer put "a gun on the table in front of [him.]"

At trial, defendant testified that he went to Mexico several days before the shooting to help his mother and did not return to Merced until after the shooting. He testified that while he was in Mexico he got sick, was admitted to the hospital, and had gallbladder surgery. None of that trial testimony was true; defendant lied because he was afraid of facing life in prison for a crime he did not commit. Defendant's family and friends also falsely testified on his behalf. Defendant did not discuss with his friends and family the lies they told on his behalf at trial. He did not know how it was that his false trial testimony was consistent with the testimony of his friends and family.

## C. The Trial Court's Ruling on the Section 1172.6 Petition

The trial court found defendant's testimony at the section 1172.6 hearing was not credible. It then explained that it considered the trial testimony and found "proof beyond a reasonable doubt that … defendant is guilty of murder and attempted murder under California law as amended by the changes to [s]ection 188 or 189 that were made effective January 1[], 2019," "even if … defendant [was not] armed with a firearm" as the jury concluded. "Specifically, there[ was] evidence beyond a reasonable doubt that [defendant] aided and abetted his co-participants by accompanying the gang, and that by accompanying his gang who were armed with firearms, he encouraged, promoted, facilitated the murder along with his co-participants." It explained defendant was "fully aware when they said, 'Let's f[**]k these guys up,' and there was a discussion of ammunition and guns, that he knew there was going to be a shooting. And by accompanying his fellow Sureño gang members, he was encouraging the shooting and aiding and abetting the shooting with a specific intent to commit the shootings and specific intent to kill." The court continued to explain its reasoning: "the more gang members that go along to commit the murder or attempted murder, there's more strength. It promotes the murder. It encourages the murder. It gives them a better opportunity to

12.

be successful in committing the murder because they have more people present who can carry out the crime."

The trial court also found there was "evidence beyond a reasonable doubt that [defendant] was the actual shooter and killer of Juan [Viera] and also that there was an area in which [defendant] used lethal force that was designed and intended to kill everyone in and around the area of the primary target. There were four victims.… [T]hat[ is] called a kill zone theory by shooting."

## DISCUSSION

## I. Sufficiency of the Evidence to Support Defendant's Murder Conviction

Defendant contends the evidence presented was insufficient to support a conviction for second degree murder. He argues, because the jury found the firearm enhancements not true, the only valid theory the trial court could have relied upon was a direct aider and abettor theory, which the evidence was insufficient to support. The People argue the evidence was sufficient to support the conviction for first degree murder under a direct aider and abettor theory based on the testimony that defendant knew about the plan to shoot at the rival gang members prior to getting into the vehicle, decided to accompany his fellow gang members during the shooting, and had purchased the .38-caliber handgun, combined with the evidence that Juan was killed by a .38-caliber shot. We agree with the People.

### A. Felony-Murder Rule, Natural and Probable Consequences Doctrine, and the Section 1172.6 Process

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) "to amend the felony murder rule and the natural and probable consequences doctrine … to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."

13.

(Stats. 2018, ch. 1015, § 1, subd. (f); see § 189, subd. (e); accord, *People v. Strong* (2022) 13 Cal.5th 698, 707–708.)

Senate Bill 1437 accomplished this task by adding three separate provisions to the Penal Code. (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder or attempted murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842–843.) Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2."[5] (§ 189, subd. (e); accord, *Gentile*, *supra*, 10 Cal.5th at p. 842.)

Third, Senate Bill 1437 added section 1172.6 (former § 1170.95) to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above." (*Gentile*, *supra*, 10 Cal.5th at p. 843.) This procedure is available to persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter …." (§ 1172.6, subd. (a).)

---

[5] Additionally, section 189 was amended to allow for felony-murder liability where the victim is a peace officer. (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672.)

"Section [1172.6] lays out a process" for a person convicted of one of the aforementioned offenses "to seek vacatur of his or her conviction and resentencing." (*Gentile*, *supra*, 10 Cal.5th at p. 853.)  After a defendant files a facially sufficient petition and the trial court determines the petitioner has made a prima facie showing, the court must issue an order to show cause[6] and hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction.  (§ 1172.6, subds. (c), (d)(1).)  At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (d)(3).)

**B.  Standard of Review**

We review a trial court's factual findings in connection with a section 1172.6 petition for substantial evidence.  (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*); *People v. Clements* (2022) 75 Cal.App.5th 276, 298.)  Thus, "[w]e ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298; accord, *Reyes* at p. 998.)  That the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.  (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071 [defendant on substantial evidence review "bears an 'enormous burden' "].)

"Our task is to review the trial court's *ruling*, not its reasoning." (*People v. Turner* (2020) 10 Cal.5th 786, 807.)  " ' "If right upon any theory of the law applicable to the

---

[6]      "If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."  (§ 1172.6, subd. (c).)

case, [the ruling] must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*Ibid.*)

### C. Analysis

As a threshold matter, defendant relies on language quoted from the order modifying our opinion on his original appeal for the proposition that defendant necessarily lacked the intent to kill. In that order, this court noted: "[Defendant] participated in an armed attack on rival gang members. [Defendant's] fellow gang members armed themselves and deliberately went into the territory of the rival gang in order to '… f[**]k these guys up.' They drove slowly down the street and fired at rival gang members. [¶] The jury necessarily determined that [defendant] aided and abetted an assault with a firearm." (*Lopez*, *supra*, F026470.) Based on this court's prior opinion, defendant contends that there is "no substantial evidence showing that [he] shared an intent to kill. Instead, at most, he aided and abetted an assault with a firearm, which is an invalid theory under current law for second degree murder." Not so. Our prior opinion described the findings the jury necessarily made based on the instructions before it when it deliberated.[7] It did not describe all of the theories under which defendant could possibly have been convicted of murder based on the evidence presented at trial or conclude that the evidence or jury findings ruled out that defendant harbored the intent to kill.

Relatedly, defendant contends it is impermissible for a court to find defendant could still be convicted of murder in a section 1172.6 proceeding based on a theory not

---

[7] The description arose in the context of assessing prejudice for possible error under *People v. Ireland* (1969) 70 Cal.2d 522, holding that felony murder cannot be premised on a felonious assault since it would relieve a jury from having to consider whether the act was committed with malice. (*Id*. at p. 539.) The court ultimately found beyond a reasonable that even without *Ireland* error, "the jury would have returned a verdict of second degree [implied malice] murder given the undisputed facts as to how the killing transpired." (*Lopez*, *supra*, F026470.)

16.

presented to or found true by a jury.  However, in a section 1172.6 proceeding, the prosecutor need only prove beyond a reasonable doubt that the defendant could still be convicted of murder under a currently valid theory, even if the jury was never instructed on the theory.  (*People v. Campbell* (2023) 98 Cal.App.5th 350, 370–371; accord, *Garcia v. Superior Court* (2024) 106 Cal.App.5th 1005, 1017–1018; *People v. Hill* (2024) 100 Cal.App.5th 1055, 1069–1070; *People v. Schell* (2022) 84 Cal.App.5th 437, 444–445, citing *People v. Flint* (2022) 75 Cal.App.5th 607, 618.)  While, as defendant correctly notes, our Supreme Court has not addressed the issue of whether denial of a section 1172.6 petition can rest upon a finding that a defendant could be convicted of murder under a theory not presented to the jury, multiple courts of appeal have addressed the issue, and we agree with their analysis.[8]  (*Garcia*, at pp. 1017–1018; *Hill*, at pp. 1069–1070; *Campbell*, at pp. 370–371; *Schell*, at pp. 444–445.)  This court's prior description of the theory under which defendant could have been found guilty at trial based on the instructions given at trial and the jury's verdict does not limit the theories under which the prosecutor was permitted to prove defendant could still be convicted of murder at the section 1172.6 hearing.

The People argue that the evidence supported convictions for murder under two theories:  defendant aided and abetted first degree drive-by murder and defendant aided and abetted implied malice murder.  Defendant responds that—under either theory—there was insufficient evidence that defendant's actions were the proximate cause of Juan's death.  We agree with the People that substantial evidence supports the trial court's conclusions that, if tried today, defendant could be convicted of either first degree drive-by murder as a direct aider and abettor or second degree implied malice murder as a direct aider and abettor.

---

[8]     Also, while not necessary to our decision, defendant failed to raise this argument below and it is thus forfeited.

### i. Aiding and Abetting a First Degree Drive-by Murder

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) It is express when there is an intent to kill. (§ 188, subd. (a)(1).) It is implied when " 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

"[M]urder that is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." (§ 189, subd. (a).)

To be liable for murder as an aider and abettor, the prosecution must show that the defendant "(i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) Thus, aider and abettor's liability is " 'based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.' " (*People v. Powell* (2021) 63 Cal.App.5th 689, 710, italics omitted, citing *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) Aiding and abetting liability " 'require[s] some affirmative action' " that assists or encourages the perpetrator in committing the crime. (*People v. Partee* (2020) 8 Cal.5th 860, 868, italics omitted.) "[T]he test is whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged [the perpetrator] by words or gestures." (*People v. Villa* (1957) 156 Cal.App.2d 128, 134.)

Defendant's primary contentions are that the evidence was insufficient to prove defendant proximately caused the shooting and there was "no proof of [defendant]'s intent when he got in the back of [the] truck." Defendant's argument regarding the

proximate cause of Juan's death follows the reasoning in *Reyes*; he contends the facts of this case are on all fours with *Reyes* and thus the same outcome should result. In *Reyes*, "[t]he prosecutor proceeded on the theory that [a codefendant] shot [the murder victim], and no evidence was presented that [the defendant's] conduct was a 'substantial factor' that contributed to the shooting." (*Id*. at pp. 988–989.) The evidence established that the defendant and a group of young men and boys between the ages of 16 and 21 congregated in a park where one of the young men showed the group a revolver he was carrying, but the record contained no evidence that the defendant knew the revolver was loaded. (*Id*. at p. 985.) Several hours later, the group, including the defendant and the young man with the revolver, "proceeded to an area on the edge of territory belonging to a rival gang and … chased after [the murder victim's] car." (*Id*. at p. 989.) While the group was stopped at an intersection, the victim's car made a U-turn and the young man with the revolver shot and killed the driver. (*Id*. at p. 985.) The court explained that going into rival gang territory and chasing after a vehicle were "acts that merely create[d] a dangerous situation in which death [was] possible depending on how circumstances unfold [which did] not, without more, satisfy [the] causation requirement [that the defendant be a substantial factor that contributed to the shooting]. There was no evidence that [the defendant's] acts precipitated or provoked the shooting. And there [was] no reason to believe that the killing of [the victim] would not have occurred if [the defendant] had not accompanied his fellow gang members on the ride or participated in the chase." (*Id*. at p. 989.) The defendant's "acts of bicycling into rival territory and chasing after [the victim's] car with [the actual shooter] and other fellow gang members were too attenuated in the chain of events to have proximately caused the killing; any causal link between [the defendant's] conduct and [the victim's] death [was] tenuous at best." (*Id*. at p. 989.)

In this case, the evidence, viewed in the light most favorable to the judgment,[9] showed several weeks before the shooting, defendant purchased a .38-caliber handgun. The night before the shooting, Norteño gang members who were part of the M Street Mob were involved in an altercation with Sureño gang members, including defendant. The following day, Keith, Alberto, and Rogelio came to defendant's home, where Keith showed defendant a handgun—likely a semiautomatic .22-caliber handgun—and said " 'let's go f[**]k these guys up,' " referring to the Norteño gang members with which they had an altercation the previous night. Defendant also had a .38-caliber handgun at that point, which he showed to the others. Alberto brought .38-caliber ammunition for defendant's handgun which defendant loaded before leaving his home. Defendant went with Keith, Alberto, and Rogelio in a truck to a location where they expected Norteño gang members to be. As Javier and others approached the truck, two of defendant's group fired at least 10 shots between the two firearms at the group of Norteño gang members. There is no evidence that any Norteño gang member was armed with a firearm at the time of the shooting or that defendant's group was armed with more than two firearms. Most of the Norteño gang members were hit by .22-caliber shots, but the fatal shot to Juan was a .38-caliber shot. An expert testified that the shooting was retaliatory and gang-related and no contrary evidence was presented.

---

[9]     While defendant admitted to firing a .38-caliber handgun during the shooting, the jury found the personal use of a firearm allegations not true as to defendant. We accordingly omit consideration of the evidence tending to reflect that defendant was the actual shooter who killed Juan. At the section 1172.6 hearing, the trial court found, as an alternative basis to deny defendant's petition, "evidence beyond a reasonable doubt that [defendant] was the actual shooter and killer of Juan [Viera] …." Defendant contends that finding was error because it was precluded by the jury's not true findings on the personal use of a firearm allegations. Because we conclude there was substantial evidence to support the trial court's alternative theory of liability—that defendant committed murder under a direct aiding and abetting theory—we do not address defendant's argument.

This case is not on all fours with *Reyes.* Unlike in *Reyes*, where the shooter showed a firearm hours before the shooting and expressed no intent to use the weapon, and where the defendant's act was riding a bicycle after a vehicle in gang territory, Keith showed defendant a firearm prior to defendant getting in the truck and told him that they were going to go "f[**]k … up" the rival Norteño gang members. The evidence further supported a finding that defendant had a .38-caliber handgun on his person when Keith, Alberto, and Rogelio arrived at defendant's home and that he showed it to the others. Defendant knew that Alberto had brought ammunition for the firearm that defendant had on his person. Two firearms were used in the shooting and the fatal shot to Juan was of the same caliber as the firearm defendant possessed prior to the shooting. While the jury concluded defendant was not personally armed with a firearm at the time of the shooting, substantial evidence supported a finding that defendant went with the other Sureño gang members to commit a shooting in retaliation for the altercation on the previous date and lent his firearm to accomplish that act. Sufficient evidence supported a finding that defendant's conduct of accompanying Keith, Alberto, and Rogelio to commit a shooting where his firearm, which he loaded in anticipation of the shooting and which was used to kill Juan, was a proximate cause of—i.e., a substantial factor in—Juan's death.

For much the same reason, substantial evidence supported a finding that defendant harbored the intent to commit a drive-by shooting. "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) Here, defendant knew that Keith and one other person in the group were armed with firearms, at least one of which was loaded, and Keith expressed an intent to "f[**]k these guys up," referring to the rival Norteño gang members. Based on that evidence, viewed in the light most favorable to the judgment, a reasonable factfinder could have found that defendant understood that he and the other Sureño gang members planned to commit a retaliatory drive-by shooting involving at least two firearms, aimed

21.

at killing rival gang members and that defendant loaded and lent his firearm and accompanied the others with the intent to accomplish that purpose.  That at least 10 shots and as many as 20 shots were fired at close range as to at least one of the Norteño gang members supports that conclusion.  (*People v. Gaines* (2023) 93 Cal.App.5th 91, 132–133.)

Substantial evidence supported the trial court's denial of defendant's section 1172.6 petition as to his murder conviction.

### ii.  Aiding and Abetting Second Degree Implied Malice Murder

Even assuming the evidence was insufficient to support a conviction for aiding and abetting first degree drive-by murder—we conclude it was not—substantial evidence supported that defendant aided and abetted second degree implied malice murder.

To prove that a defendant is guilty of implied malice murder as a direct aider and abettor, "the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act [i.e., murder].  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life."  (*People v. Powell*, *supra*, 63 Cal.App.5th at p. 713.)  In other words, under the direct aiding and abetting theory, the prosecutor "must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' "  (*People v. Gomez* (2018) 6 Cal.5th 243, 279.)  "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought."  (*Gentile*, *supra*, 10 Cal.5th at p. 848.)

The only difference in the analysis for this case of whether sufficient evidence supported second degree implied malice murder or the theory discussed in the previous section is whether defendant harbored an express intent to kill or intended to aid and abet

22.

the commission of an act dangerous to human life. As discussed in the previous section, when defendant entered the truck to accompany his fellow Sureño gang members, he knew that they intended to "f[**]k … up" the rival Norteño gang members as retaliation for the events of the previous night by shooting them; he had loaded his gun for that purpose and he had seen Keith's gun. If nothing else, defendant intended to aid an act he knew was dangerous to human life by aiding his fellow Sureño gang members in shooting rival Norteño gang members. (See *Reyes*, *supra*, 14 Cal.5th at pp. 991–992.)

Under this second theory, substantial evidence supported the trial court's denial of defendant's section 1172.6 petition as to his murder conviction.

## II. Sufficiency of the Evidence to Support Defendant's Attempted Murder Convictions[10]

Defendant contends the evidence was insufficient to support his attempted murder convictions because "[t]here was no evidence that [he] shot the three attempted murder victims." He also contends that insufficient evidence supported a theory that defendant is guilty of attempted murder as an aider and abettor. In response, the People implicitly concede that defendant could not be convicted of attempted murder as the actual shooter, but argue that defendant aided and abetted three acts of attempted murder. Again, we agree with the People.

The parties agree, as do we, that to be guilty of attempted murder as a direct " 'aider and abettor a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty

---

[10] The statutory framework and standard of review outlined in the previous section of this opinion also apply to this section. We do not repeat them here.

23.

of attempted murder as an aider and abettor must intend to kill.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054, quoting *People v. Lee* (2003) 31 Cal.4th 613, 624.)[11]

The People argue that defendant could still be found guilty of the three attempted murders for essentially the same reason he could still be found guilty of murder—he "was a Sureño gang member who went with his fellow gang members to hunt for their gang rivals. The group took multiple loaded firearms on their hunt. The evidence of gang motive, which is overwhelming, was probative on his specific intent to kill. [Citation.] Appellant admitted to the police that he had obtained the .38-caliber handgun that was later used to gun down Juan and endanger Javier, Anthony, and Manuel. By furnishing that handgun, he aided, promoted, and encouraged three counts of attempted murder." Defendant responds that the People's argument is meritless because "[t]here is no evidence that [defendant] had or fired a gun … [or] furnished the .38-caliber gun which killed Juan. And the three attempted murder victims were shot with a .22-caliber gun. There is no evidence tying [defendant] to a .22." Moreover, defendant argues, "there is no evidence that [he] had the specific intent to kill, or that he aided and encouraged an attempted murder knowing of the direct perpetrator's intent to kill, and intending to facilitate the killing."

First, defendant is mistaken that there is "no evidence" that he had a gun or furnished the .38-caliber gun which killed Juan. In his statement to officers, which was

---

[11] Defendant contends *Nguyen* "no longer applies" but provided no explanation for why he believes it no longer applies. Instead, he contends that to be convicted of attempted murder of the three victims, the government must prove that [defendant] … aided and encouraged an attempted murder knowing of the direct perpetrator's intent to kill, and intending to facilitate the killing." Defendant attributes that position—which is actually a partial quotation from *People v. Gonzalez* (2012) 54 Cal.4th 643, 654 footnote 8, which also cites to *People v. Lee*, *supra*, 31 Cal.4th at p. 624—to *People v. Canizales*, *supra*, 7 Cal.5th at p. 602, which addresses the "kill zone theory of attempted murder liability" and not the issue for which it is cited. Thus, despite the purported disagreement, the parties are actually in agreement regarding the elements required to be found guilty of attempted murder as a direct aider and abettor.

played for the jury, defendant admitted he purchased a .38-caliber five-shot handgun; when Keith, Alberto, and Rogelio came to his home, Keith said " 'let's go f[**]k these guys up,' " and displayed a handgun; Alberto brought ammunition for defendant's handgun, which defendant loaded before they entered the truck; and Juan was killed by a .38-caliber round. While the jury found defendant did not personally use a firearm during the shooting, substantial evidence supported the reasonable inference that defendant's firearm was used in the shooting, and it was furnished by defendant to one of the other Sureño gang members for the specific purpose of use in the shooting. That the circumstances might also reasonably have been reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Thomas*, *supra*, 15 Cal.App.5th at p. 1071.

Second, defendant argues that "there [was] no evidence tying [him] to a .22[-caliber firearm]. Again, for all purposes relevant to his petition regarding the attempted murder convictions, he is mistaken. In his statement to law enforcement, defendant said that Keith was armed with a .22-caliber semiautomatic handgun that defendant saw before leaving defendant's home. Defendant accompanied Keith and substantial evidence supports a finding that defendant understood that Keith and at least one other person intended to shoot the rival Norteño gang members in retaliation for the events of the previous day. That the attempted murder victims were hit with .22-caliber rounds rather than rounds from the .38-caliber handgun defendant furnished is irrelevant for purposes of whether defendant aided and abetted attempted murder. By furnishing the .38-caliber firearm and accompanying his fellow Sureño gang members to commit a retaliatory shooting, defendant proximately caused, even though he did not personally inflict, the harm. (*People v. Bland* (2002) 28 Cal.4th 313, 337–338; *People v. Sanchez* (2001) 26 Cal.4th 834, 845–847.)

Third, as to defendant's intent, substantial evidence supports the finding that defendant understood that his fellow Sureño gang members intended to commit a

retaliatory drive-by shooting targeting all rival Norteño gang members at the intersection where they expected to find the Norteño gang members and intended to use at least two firearms to accomplish that purpose. With that knowledge, defendant furnished a firearm for use in the shooting and accompanied his fellow Sureño gang members to commit the shooting. Keith and one of defendant's other cohorts fired between 10 and 20 shots at the group of Norteño gang members. As this court found in deciding defendant's original appeal from the judgment, "[a]ll of these facts support an inference that [defendant] and his cohorts were intent on inflicting death."

In short, sufficient evidence supported a conclusion that defendant could still be convicted of attempted murder after the changes brought about by Senate Bill 1437 under a theory that he directly aided and abetted in the attempted murders of Javier, Anthony, and Manuel.[12] The trial court did not err in denying defendant's petition on that basis.

## III. Consideration of Defendant's Youth

Defendant was 19 years of age at the time of the offense in this case. He contends the trial court erred in failing to consider his youth at the time of the offense and its impact on his mental state. The People respond that defendant forfeited the argument by failing to raise it below; assuming the trial court had a sua sponte duty to consider defendant's youth, any error was harmless; and counsel at the section 1172.6 hearing was not ineffective for failing to raise the issue. Defendant's claim fails on its merits.

Defendant did not raise the issue of his youth or object that the trial court had not considered his youth below. The failure to raise an issue below forfeits a claim on appeal; a principle applicable to constitutional claims. (*People v. Myles* (2021) 69 Cal.App.5th 688, 696; *People v. McCullough* (2013) 56 Cal.4th 589, 593.) However, because defendant contends, assuming the issue is forfeited, his counsel was ineffective

---

[12] Because we conclude sufficient evidence supported this theory, we do not address defendant's contention that the trial court erred in relying on a kill zone theory for the attempted murder convictions.

in failing to raise the issue below, we exercise our discretion to reach the merits of his claim to forestall the claim of ineffective assistance of counsel.  (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [an appellate court has authority to reach a forfeited claim]; *People v. Crittenden* (1994) 9 Cal.4th 83, 146 [reviewing court may exercise discretion to consider forfeited claims to forestall ineffective assistance of counsel arguments].)

The People argue that defendant's youth—normally considered in determining whether a youthful defendant appreciated the risk to human life involved in their actions (see *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1377)—had no bearing on the analysis because defendant committed a first degree drive-by shooting as an aider and abettor and three counts of attempted murder, all of which required express malice, i.e., the intent to kill.  Defendant again responds that his jury was never instructed on first degree drive-by murder and the trial court could therefore not consider it at a section 1172.6 hearing.  We agree with the People.

" '[T]he " 'hallmark features' " of youth include " 'immaturity, impetuosity, and failure to appreciate risks and consequences.' "  [Citations.]  " '[T]he background and mental and emotional development of a youthful defendant [must] be duly considered' in assessing his culpability."  [Citations.]  "[T]hey 'are more vulnerable or susceptible to … outside pressures' than adults …."  [Citation.]  A juvenile's immaturity and failure to appreciate the risks and consequences of his or her actions bear directly on the question whether the juvenile is subjectively " 'aware of and willingly involved in the violent manner in which the particular offense is committed' " and has "consciously disregard[ed] 'the significant risk of death his or her actions create.' " ' "  (*In re Harper* (2022) 76 Cal.App.5th 450, 469.)  However, California courts have extended consideration of a young adult offender's age only as far as resentencing petitions involving the felony-murder rule or implied malice murder; they have not extended it to express malice murder.  (*People v. Jimenez* (2024) 103 Cal.App.5th 994, 1005; *People v.*

27.

*Pittman* (2023) 96 Cal.App.5th 400, 417–418.) That is so because a defendant who acts with express malice intends that his or her conduct result in death; a youth's commission of murder with express malice does not clearly implicate the same concerns regarding failure to appreciate risks and consequences of dangerous conduct that led or could have led to one or more deaths. We will for the first time require a trial court to consider a defendant's youth when they are found to have harbored express malice in committing murder or attempted murder.

Because the trial court found, and we conclude that substantial evidence supported the findings, that defendant committed first degree murder as an aider and abettor and attempted murder as an aider and abettor, no authority required the trial court to consider defendant's youth as it was not a relevant consideration. The court did not err by not considering defendant's youth at the time of the offense.

## **DISPOSITION**

The order is affirmed.